## GENERAL AMERICAN TRANSPORTATION CORPORATION, Plaintiff,

v.

## CRYO–TRANS, INCORPORATED, Defendant.

## CRYO–TRANS, INCORPORATED, Counterclaim–Plaintiff,

v.

## GENERAL AMERICAN TRANSPORTATION CORPORATION, Counterclaim–Defendant.

### No. 91 C 1305.

United States District Court, N.D. Illinois, Eastern Division.

July 14, 1995.

---

776

Scott William Petersen, Thomas Irving Ross, Randall Thomas Erickson, Hill, Steadman & Simpson, Chicago, IL, for plaintiff General American Transp. Corp.

James P. Donohue, Bruce A. Kaser, Miller, Nash, Wiener, Hager & Carlsen, Seattle, WA, Kenneth E. Rechtoris, Carol Ann Genis, Bell, Boyd & Lloyd, Chicago, IL, for defendant Cryo–Trans, Inc.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

Due to the continued fast pace of American life, the production of frozen food products has continually expanded during the last decade. Yet, because railroad carriers had not replaced aging mechanical refrigeration cars since the early 1970's, the American transportation system explored the feasibility of using liquid carbon dioxide ("$CO_2$") to create cryogenic railcar systems which could economically transport frozen food products. These developments led to the dispute in this case.

Beginning on May 1, 1995 and continuing through May 10, 1995, this Court held a bench trial on this matter. During this patent trial, this Court has been called upon to decide questions of patent validity and infringement concerning competing cryogenic refrigerated railcars. During the trial, the Court received testimony and documentary evidence and conducted a site visit to personally inspect and view the railcars at issue in this case. Thereafter, the Court considered the written post-trial submissions filed by each party. The Court hereby enters the

following Findings of Fact and Conclusions of Law, which in contrast to its prior order in this matter, are based upon consideration of all the admissible evidence as well as this Court's own assessment of the credibility of the trial witnesses. To the extent, if any, that the Findings of Fact as stated may be deemed Conclusions of Law, they shall be considered Conclusions of Law. Similarly, to the extent that matters expressed as Conclusions of Law may be deemed Findings of Fact, they shall also be considered Findings of Fact.

### FINDINGS OF FACT

1. This case involves a patent dispute between General American Transportation Corporation and Cryo–Trans Inc.

2. Plaintiff General American Transportation Corporation ("GATC") is a corporation organized under the laws of New York, with its principal place of business in Chicago, Illinois.

3. Defendant Cryo–Trans, Inc. ("Cryo–Trans") is a corporation organized under the laws of Maryland, with its principal place of business in Mt. Airy, Maryland.

4. GATC's claim is an action for declaratory judgment, pursuant to 28 U.S.C. § 2201, with respect to the enforceability of United States Patent 4,704,876 ("the '876 Patent") against a cryogenic railcar produced and marketed by GATC. (Pl.'s Ex. A).

5. The '876 Patent is owned by Cryo–Trans which has counterclaimed for patent infringement pursuant to 35 U.S.C. § 281. Figure 1 of the '876 Patent is hereby incorporated into this opinion as Appendix A. (Pl.'s Ex. A).

6. Venue in this case is proper under 28 U.S.C. §§ 1391 and 1400(b) and jurisdiction is proper under 28 U.S.C. § 1338.

7. On March 1, 1991, GATC filed a four-count complaint against Cryo–Trans seeking a declaratory judgment that the '876 Patent, issued to Mr. Ralph P. Hill on November 10, 1987, and entitled *"Cryogenic Refrigeration System"*, is invalid, void and unenforceable, and further that the '876 Patent is not infringed by GATC's cryogenic refrigerated boxcar design, presently commercialized in the United States under the tradename "Articar". The complaint also sought a preliminary injunction enjoining Cryo–Trans from threatening patent infringement and other related litigation against actual and prospective users of GATC Articar boxcars. The extensive procedural history of this case includes a five-day hearing held before Magistrate Judge Rosemond in July, 1991, on the parties' cross-motions for preliminary injunction. On August 12, 1994, Magistrate Judge Rosemond issued a formal Report and Recommendation which found in favor of GATC with respect to the issues raised before him in the parties' cross-motions for preliminary injunction.

8. This Court adopted the recommended findings in the Magistrate Judge's Report in a Memorandum Opinion dated December 20, 1994, which granted a preliminary injunction in favor of GATC, except that this Court rejected, as premature, Magistrate Judge Rosemond's recommendation that GATC's motion for attorney fees under 35 U.S.C. § 285 be granted. The Court's December 20, 1994 order expressly indicated that this Court had not made any final determinations on the merits of this case.

9. GATC has been in the business of leasing railcars to the railroad industry for approximately 80 years, and for many years with respect to the business of manufacturing and leasing mechanically refrigerated railcars. In late 1990, GATC introduced a prototype non-mechanical, cryogenically refrigerated railcar using a bunker-style design. This prototype cryogenic railcar was designated the GARX 68000, and was built under the supervision of Mr. Erling Mowatt–Larssen, GATC's Director of Engineering. The GARX 68000 was built and used only for demonstration and marketing purposes to solicit orders from frozen food shippers for the company's anticipated production of a cryogenically refrigerated railcar called the "Articar." The prototype railcar has never been, and is not, available for lease by customers.

10. Around April of 1991, the GARX 68000 was modified several times to become the GATX production car design styled the

"Arcticar." Thereafter, in November of 1991 GATC obtained United States Patent 5,168,-717 which incorporated the modified design. Figure 1 from this patent is hereby incorporated into this opinion as Appendix B. (Def.'s Ex. 228). The primary modification was the blocking up of the openings in the bunker floor adjacent the end walls. As a result, the Arcticar production railcar has no openings adjacent the end walls of the car. In early 1991, GATC obtained its first order for Arcticar railcars.

11. Cryo–Trans is the owner by assignment of the '876 Patent. (Def.'s Ex. 139). In 1985, Mr. Marvin H. Weiner formed a sole proprietorship named "Cryo–Trans" for the purpose of developing a business involving the leasing of cryogenically refrigerated railcars. Cryo–Trans was incorporated to form Cryo–Trans, Inc. in 1987. Mr. Weiner is the chief executive officer and president of Cryo–Trans, Inc. Cryo–Trans' cryogenically refrigerated railcars are referred to as CRYX railcars. Mr. Weiner is also the president of Mt. Airy Cold Storage ("Mt. Airy"), a frozen food storage facility used by frozen food processors which is located in Mt. Airy, Maryland.

12. The declared inventor of the '876 Patent is Mr. Ralph P. Hill. Mr. Hill has not obtained other patents. (Tr. 118, 122).

13. At all relevant times prior to his retirement in 1988, Mr. Hill was vice president of distribution at Lamb–Weston, Inc. in Portland, Oregon. (Stip. No. 5). He was also a past chairman and long-time member of the American Frozen Food Institute's Physical Distribution Council. Mr. Hill is credited with having made many outstanding contributions in rail transportation of frozen foods.

14. A critical issue facing the frozen food industry in the 1980's was the availability of mechanical refrigerator cars owned by the nation's railroads. The then-current policy of the railroads was not to replace aging mechanically refrigerated railcars as they became unserviceable. The frozen food industry's dependence on mechanical refrigerator cars for long-haul movement was expected to be compounded by the continuing escalation of diesel fuel prices which would preclude long-haul truck movement and make the in-dustry even more dependent on the railroads. Finding an alternative to the use of mechanical refrigerator cars had been a high priority matter for the American Frozen Food Institute Distribution Council and Transportation Committee since at least 1982.

15. The American Frozen Food Institute ("AFFI") and the International Association of Refrigerated Warehouses ("IARW") through the Refrigeration Research Foundation jointly formed a cryogenic railcar research and development task force (AFFI–IAWR Refrigerated Railcar Task Force) to explore the feasibility of using total loss refrigerants, such as liquid $CO_2$ to ensure an adequate transportation system for the expected growth of the frozen food industry. The United States Department of Agriculture provided the scientific monitoring and evaluation for the test shipments. Additionally, there was substantial resource involvement by the Burlington Northern Railroad.

16. Recognizing that the supply of mechanically refrigerated cars was steadily declining, Mr. Hill initiated the Cryogenic Rail Car Research Project. The project involved development of prototype railcars that relied on $CO_2$, rather than mechanical systems, to provide refrigeration. Hill was a leading force behind the project.

17. Mr. Hill first initiated the Cryogenic Rail Car Research Project under the joint sponsorship of the AFFI and IARW, and later through a separately incorporated organization called the American Frozen Food Cryogenic Association for Rail Car Research—better known as AFFCAR—which was a non-profit shipper's association formed to purchase refrigerated railcars with which the AFFI cryogenic research and development task force could experiment. Hill was chairman and leader of AFFCAR throughout its existence. Throughout the Cryogenic Rail Car Research Project, Mr. Hill championed the need for research, raised funds, supervised the design, engineering and testing of prototype railcars, and kept the frozen food industry informed of the progress of the research. In 1985, he was recognized by the frozen food industry for his work in champi-

oning the need for cryogenic research, raising funds to build prototype cars, supervising design work, and engineering and testing prototype cars. (Def.'s Exs. 14, 22, 23, 30, 47, 233 ¶ 28, 234 ¶¶ 17–18, 235 ¶¶ 15, 16, 21).

18. During 1980–1985, AFFCAR and/or Burlington Northern built a number of prototype cryogenic cars which were identified as the BNFE 3, AFFX 2001, AFFX 2002 and AFFX 2003 during the trial.

19. The AFFI task force decided that an insulated railcar loaded with frozen food and given an initial charge of cryogen would most likely be a technically and economically feasible cooling system. A series of test shipments were conducted over a one year period to determine the feasibility of using $CO_2$ as an alternative refrigeration source for railcar shipments of frozen foods. The Burlington Northern Railroad donated its modified mechanical refrigerator test car ("the BNFE 3") to be used in the AFFI cryogenic railcar project study. The BNFE 3 was a refrigerated railcar originally built as a meat car in 1966, and rebuilt with under-the-floor air delivery and a truck-type nosemount mechanical refrigeration unit in 1976. It was modified for $CO_2$ snow refrigeration in June of 1980. Seven shipments of various frozen commodities in the summer and fall of 1980 and the winter and spring of 1981 were made. The mechanical unit was not used during the testing. Upon evaluation of the test data from the BNFE 3 test shipments, the cryogenic railcar research task force concluded that the cryogenic refrigeration concept warranted further testing and consideration.

20. Ralph Hill, James Fink, Eddie Barron, LeRoy Couture and Bill McCollister were principally involved in the reconstruction of the BNFE 3 railcar in 1980. (Tr. 72). The BNFE 3 was a converted mechanical refrigeration car, which utilized an overhead rectangular manifold at the ceiling of the car to spray $CO_2$ directly on the load. It utilized a single loading of $CO_2$ at the place of embarkation. (Tr. 71–72). The BNFE 3 car proved that $CO_2$ had applications for use in transportation of frozen food, but had drawbacks which did not allow the entire load to

remain consistently frozen during the entire trip. (Tr. 73).

21. With promising results from the BNFE 3 test shipments, the task force proceeded to plan and design the construction of a prototype cryogenic railcar with an onboard $CO_2$ temperature control system with no mechanical or electric parts; thus, eliminating costly mechanical diesel powered refrigeration. Construction of the prototype car—the AFFX 2001—was completed in January of 1983.

22. The AFFX 2001 car was built for AFFCAR as an attempted improvement over the BNFE 3 car. The AFFX 2001 utilized tanks of liquid $CO_2$ beneath the floor of the loading area to carry a supply of $CO_2$ on the railcar as well as a computer to sense temperature changes and to direct release of $CO_2$ snow on the load. (Tr. 81).

23. The salient features of the *"AFFX 2001—Prototype Car Design"* were as follows:

The car is equipped with a liquid carbon dioxide refrigeration tank system. The system stores liquid carbon dioxide under pressure at zero degrees Fahrenheit in a series of interconnected aluminum storage tanks placed lengthwise to the car beneath the car's aluminum floor. The tank system not only provides in transit storage for liquid carbon dioxide, but also acts as a barrier to heat entering the car and functions as a giant cold plate to keep the load frozen.

An initial blanket of carbon dioxide snow is deposited in the air on top and around the load prior to departure from the loading warehouse. While in transit, the load receives additional charges of snow triggered by a thermostatically controlled temperature sensor in the ceiling of the car above the air and load. Operation of the refrigeration system requires only pneumatic power provided by the pressure of the liquid carbon dioxide. No electrical nor diesel power is needed. The prototype car is the largest and best insulated refrigerator car ever built. The car utilizes state of the art compressed polyurethane foam in place insulation placed behind interior fiberglass roof and wall panels with spe-

cially designed deep corrugated channels to allow the free flow of carbon monoxide gas over and around the load of frozen food. The exterior of the car is painted with a high gloss reflective acrylic white paint specially formulized to maximize reflection of radiant heat from the sun to provide an exterior surface that can easily be cleaned.

The prototype car has a capacity of 4,904 cubic feet, compared with the 4,050 cubic feet capacity of existing mechanical cars. The overall exterior length of the car is nearly 65 feet. The interior length is 58 feet.

As evident from the above-quoted description, the AFFX 2001 was equipped with an under-the-floor liquid $CO_2$ cooling system, corrugated paneling on the side walls, and a piping system with which to inject liquid $CO_2$ directly on top of the cargo to form $CO_2$ snow. The AFFX 2001 proved impractical because of the extra weight of the car from the storage tanks of liquid $CO_2$ and because the computers, which controlled the release of $CO_2$ while in transit, were subject to breakdown due to the difficulties of the rail environment. (Tr. 83).

24. Mr. Hill was part of a group of people who helped to design the AFFX 2001. Other persons involved in designing the AFFX 2001 included Messrs. Fink, Habel, Couture and Jenkins.

25. One of the problems with the AFFX 2001 Cryogenic Prototype Railcar Design was that direct contact of solid $CO_2$ with the frozen cargo caused over-freezing of the frozen food product near the top of the shipments. The solution to the problem was to put a bunker between the cargo and the solid $CO_2$. Accordingly, in a subsequent phase of the task force's cryogenic railcar research, the Burlington Northern Railroad modified two existing large cube mechanical refrigerator cars with the Rubin Carbonaire Plate $CO_2$ Snow Bunker System. The two cars were called the AFFX 2002 and the AFFX 2003, and operated as follows:

These cars are equipped with a snow bunker which consists of a sheet metal chamber across the interior ceiling of the car. Liquid $CO_2$ is charged under pressure to supply lines accessible from either side of the A end (end opposite the brake wheel end) to the overhead bunker. As the liquid $CO_2$ is charged into the non-pressurized atmosphere in the bunker, it converts to snow which accumulates in the bunker under the entire ceiling of the car. The under surface of the bunker, which is the interior ceiling of the car, is insulated to control the sublimation (melting) of the snow and prevents extreme cold air from reaching the product in the car. As the $CO_2$ sublimates, the cold air drops down the side walls and around the load. ($CO_2$ is 52% heavier than air.)

The AFFX 2002, which evolved over a two year period, utilized an overhead bunker to store the $CO_2$ snow after charging. (Tr. 856). The idea of using an overhead bunker was a result of collective discussions between Bill McCollister, James Fink, LeRoy Couture and Ralph Hill. (Def.'s Ex. 233 ¶ 18, Tr. 90).

The Burlington Northern took the AFFX 2002 and the AFFX 2003 back after the AFFCAR project and put both cars in their fleet, and built 75 additional such cars in the remaining part of 1985—after March of that year.

26. The AFFX 2002 was an experimental car. (Tr. 866). It went on two test runs before ratification (Tr. 838–39; Barron Dep. at 30–31). The AFFX 2002 design showed that an overhead bunker might be a useful innovation. Nevertheless, the AFFX 2002 still needed improvement. Improvement was made to the design of the exhaust vents and floors which were incorporated into the AFFX 2002 for subsequent test runs and into the AFFX 2003, which was identical to the AFFX 2002, except for its overall length. (Tr. 435; Def.'s Ex. 233 ¶ 15; Habel Dep. at 145–46; Barron Dep. at 21). Mr. Fink was principally responsible for the design of the AFFX 2002. (Tr. 163).

27. The cryogenically refrigerated railcar designated AFFX 2002 was built by employees of the Burlington Northern in June–July of 1983. Burlington Northern sold the railcar to AFFCAR after its completion. (Tr. 165, 437). This railcar was used to transport frozen food product from the State of Wash-

ington to an unloading site near Kansas City, Kansas, in the summer of 1983. Ralph Hill was familiar with the AFFX 2002 railcar construction. (Stip. No. 2). He witnessed the loading, testing, and unloading of the AFFX 2002 in 1983 and understood its construction. (Id.). Ralph Hill publicly asserted that the technology was available for anyone in the trade to use. (Pl.'s Ex. HH).

28. The AFFX 2002 was a converted mechanical refrigerator car having corrugated side and end walls, aluminum floor racks, corner floor drains used as cargo area vents, and an overhead bunker. (Pl.'s Exs. DF; DF(A). The bunker had screened vents along one side and alternating $CO_2$ nozzles penetrating into the duct. (Pl.'s Exs. DF, DF(A), EO). The bottom wall of the air duct was insulated. (Pl.'s Ex. EO). The $CO_2$ nozzles were connected to a $CO_2$ manifold pipe running the length of the car and connectable to an outside source of liquid $CO_2$. (Pl.'s Ex. DF, DF(A)). The aluminum floor racks were of a herringbone construction with spaced apart slats running obliquely transversely and supported by lengthwise stringers to support the load. (Pl.'s Ex. DF; DF(A)). The stringers formed a plurality of parallel lengthwise channels for allowing $CO_2$ gas to flow beneath the cargo. A center rail between the floor racks would make it difficult for $CO_2$ gas to flow side to side under the floor. (Pl.'s Exs. DF(A), DX; Tr. 821–822, 826, 859–860).

29. When the AFFX 2002 railcar was initially charged with $CO_2$, the doors were kept ajar to relieve pressure. (Def.'s Ex. 233 ¶ 16, Barron Dep. at 32–33). Although the drain vents at each of the corners of the AFFX 2002 railcar were kept open during the charging phase, most of the pressure was relieved through the open door. (Tr. 867, 1071–72; Barron Dep. at 32–34). If the door was not kept open, the roof of the car was in jeopardy of being blown off because the drain vents were not sufficient to relieve pressure. (Tr. 446–47).

30. There is a dispute as to how the sublimated $CO_2$ gas would flow in the AFFX 2002. Many of the people involved in developing the AFFX 2002, including Messrs. Hill, Couture, Habel and Barron, believed that its $CO_2$ gas would drop down the sidewall nearest the bunker toward the aluminum floor racks, pass through the gaps between the slots on the aluminum floor racks beneath the load, and then go up on the opposite sidewall of the car and over the top of the load. (Tr. 87–88; Def.'s Ex. 233 ¶ 14; Tr. 445; Habel Dep. at 148; Barron Dep. at 18). Mr. Fink, who also was involved in the design of the AFFX 2002, however, believed that the gas would flow on top of the load and go down both sidewalls. (Tr. 849). This theory of gas flow is contrary to what is claimed as the gas flow in the Fink and Habel Patent. (Pl.'s Ex DF; Tr. 858). While GATC's in-court demonstration was of interest in trying to determine through the use of a simulated model how the AFFX 2002 actually may have worked, (Pl.'s Ex. HK), it is not entitled to much weight because it does not answer the question of how the relevant persons in the art believed the AFFX 2002 worked during the relevant time period.

31. Mr. Hill was involved in providing input and design assistance for the BNFE 3, the AFFX 2001, and the AFFX 2002/2003 cars. (Tr. 22, 84, 90, 418–20, 425–26). The development of a successful cryogenic railcar was very much an evolutionary process involving trial and error. Mr. Hill was the only person who was aware of everything that was going on in connection with AFF-CAR activities. He was the only person actively involved in the development phase of each and every prototype car developed by AFFCAR. (Def.'s Ex. 234).

32. Each of the prototypes developed by AFFCAR and/or Burlington Northern had problems. However, by 1985, Burlington Northern began to commercialize the AFFX 2002/2003 design and built 75 railcars incorporating the AFFX 2003 design. Burlington Northern indicated to the industry that it was going to seek a patent. As a result, AFFCAR disbanded in March 1985. (Tr. 92–93).

33. At the time AFFCAR disbanded in March of 1985, Mr. Hill and his employer Lamb–Weston knew that there were problems with the AFFX 2002/2003 design. In particular, it was generally known that the car had hot spots along the sidewall opposite

the bunker vents, were, resulting in the thawing of frozen product by the time it reached the east coast. Therefore, Lamb–Weston instructed Mr. Hill to continue working on the development of a successful cryogenic car. (Tr. 95–96).

34. Burlington Northern patented the AFFX 2002/2003 design. The patent issued as U.S. Patent No. 4,593,536 to two Burlington Northern employees, James K. Fink and David H. Habel ("Fink and Habel Patent"). (Pl.'s Ex. CQ; Tr. 92–93). The Fink and Habel Patent specifically disclosed that "[w]hen the refrigerant flakes sublimate in the bunker, the vapor flows from the bunker out the screen mesh, down the channel of the first sidewall, across the air flow channel and up the channel of the second sidewall, all by convection." (Pl.'s Ex. CQ). Ultimately, Burlington Northern refurbished 75 cars utilizing a modified AFFX 2002/2003 design. These cars were not effective because they suffered from hot spots on the sidewall. As a result, the Burlington Northern cars were never accepted in the marketplace, and ultimately were taken out of service. (Def.'s Ex. 233 ¶¶ 14–21).

35. The design that ultimately led to the '876 Patent was conceived by Mr. Hill during the summer of 1985. (Tr. 96; Def.'s Ex. 233 ¶ 22). During the summer of 1985, Mr. Hill spoke often to Mr. Jenkins, a fellow employee at Lamb–Weston, about how a $CO_2$ car should be designed. (Tr. 733–734). Mr. Hill often pulled out pieces of paper and made sketches. During the summer of 1985, Mr. Hill described a potential design for a $CO_2$ car to Mr. Jenkins which included a false ceiling created by the use of a bunker. (Tr. 737). During this same time period, Mr. Hill also described this idea to a Mr. LeRoy Couture, a marketing manager with the Burlington Northern. (Def.'s Ex. 233 ¶ 13). Mr. Hill's idea included use of vents along both sides of the ceiling bunker, as well as the use of corrugated walls on the end walls and the side walls and flooring of the car. (Tr. 754). (Def.'s Ex. 235). Mr. Jenkins also saw Mr. Hill with blueprints regarding this design. (*Id.*; Tr. 747–49). Blueprints, which reflected Mr. Hill's design, were prepared by Lamb–Weston's engineering draftsman during the summer of 1985. (Tr. 96).

36. Mr. Hill's employer, Lamb–Weston, was not interested in manufacturing railcars. It was interested in having someone else make them for Lamb–Weston's use. (Tr. 266).

37. Mr. Weiner knew Mr. Hill because of the business relationship between Mt. Airy and Lamb–Weston. Mr. Weiner was familiar with the Burlington Northern cryogenic railcars because they had been off-loaded at Mt. Airy. Because of this, he also knew that the Burlington Northern cars—AFFX 2001 and 2002 (which were the AFFCAR prototypes)—had "hot spots" resulting in a thawing of frozen food product by the time the cars reached Mt. Airy. (Tr. 252).

38. Mr. Weiner recognized the commercial potential of cryogenic railcars as a replacement to mechanical cars. Mr. Weiner and Mr. Hill agreed to work together to build a new prototype cryogenic railcar. Mr. Weiner agreed to fund the construction of a new prototype. (Tr. 253–54).

39. Mr. Weiner and Mr. Hill acquired and modified one of the AFFCAR prototypes, the AFFX 2001, into a new design. However, because the previously used construction facilities were no longer available, Messrs. Weiner and Hill had to find another party to do the modification work they desired. (Tr. 254).

40. Mr. Hill first met James S. Moe of C.V. Engineering in October of 1985. (Tr. 99; Stip. No. 3). At all relevant times, the company was commonly referred to simply as Cryo–Van, a company principally operated by James S. Moe and Tom Maxwell. Mr. Hill's initial meeting with Mr. Moe led him to believe that Cryo–Van had the capability of modifying the AFFX 2001 into his new design because Cryo–Van had the capability to manufacture fiberglass which was an important component of the new design. (Tr. 100–101).

41. In late 1984, James Moe, with the assistance of Tom Maxwell, designed and developed a cryogenically refrigerated "all purpose container" for the transport of frozen fish. Mr. Moe is a natural mechanic with

cryogenic experience. His real expertise is in design and finding creative practical solutions to mechanical problems. The container included a bunker (or tray) extending the full length and width of the container to serve as a false ceiling above the fish cargo and upon which solid carbon dioxide was placed. The bunker served the same purpose as all bunkers holding refrigerants such as solid carbon dioxide, *to-wit:* to prevent direct contact of the refrigerant with the cargo below and, thus, avoiding overfreezing of the top of the load. Cryo–Van's bunker was formed with vent openings along the side walls of the container to permit sublimated carbon dioxide gas to flow naturally down from the bunker to the cargo below.

42. In October of 1985, Mr. Hill sent blueprints of his design and of the original railcar which was to be converted into the new design (the AFFX 2001), to Cryo–Van. (Tr. 100). Mr. Moe ultimately threw away the blueprints sent to him by Mr. Hill. (Tr. 903). After receiving blueprints from Mr. Hill, C.V. Engineering submitted a bid to Mr. Hill in the amount of $22,150 by letter dated October 29, 1985. (Def.'s Ex. 21). This letter specifically acknowledges receipt of the blueprints from Mr. Hill and itemizes in detail the various changes requested by Mr. Hill for modification of the AFFX 2001 into the new design which ultimately became known as the CRYX 1000. (*Id.*) Mr. Moe acknowledged that Mr. Hill's prior designs included a bunker-type compartment. (Pl's Ex. HP at 690).

43. Cryo–Van converted the AFFX 2001 to the CRYX 1000. Although who actually designed the CRYX 1000 is not without some controversy, the evidence indicates that it is more likely than not that Mr. Hill principally designed the CRYX 1000.

44. The October 29, 1985 letter from Cryo–Van to Ralph Hill, while he was at Lamb Weston, Inc., confirms that the blueprints were sent to Cryo–Van by Mr. Hill. The first paragraph of the letter reads in pertinent part as follows:

> I [Tom Maxwell, General Manager of Cryo–Van] also thank you [Ralph Hill] very much for your prompt arrangement for expediting your blueprints on above matter. . . .

The Court specifically finds by a preponderance of the trial evidence that it is more likely than not that this language referred to blueprints of Mr. Hill's design.

45. The second full paragraph of the October 29, 1985 letter reads in pertinent part as follows:

> Pursuant to our recent discussion on refurbished rail car # 2001 to B[u]nker type rail car, we would like to offer you our proposal after carefully review[ing] your blueprints as follows:
>
> \*   \*   \*   \*   \*   \*
>
> 2.  To remove existing end wall skins and install a vent from plenums to upper extremity of the end walls,
> 3.  To make up and install a plenum at each end of the All–Air floor to connect to the vent to relieve the flash gas from the car at floor level, this insures that all the gas is used for cooling before being emitted to the outside,
>
> \*   \*   \*   \*   \*   \*
>
> 5.  To install Fluted fiberglass panels on the end walls,
> 6.  To install bunker system designed and built by C.V. System Engineering, Inc.
> 7.  To install a single centered $CO_2$ manifold designed and built by C.V. System Engineering, Inc. with load, test and bleed controls under the car at one end.
>
> \*   \*   \*   \*   \*   \*
>
> 10.  To remove the existing floor, tanks and grid work that now make up floor,
> 11.  To build up from the sub-floor to the base for the All–Air floor,
> 12.  To install an All–Air floor.

Although Cryo–Van helped to improve the original Hill design, this letter does not, contrary to GATC's position, indicate that Cryo–Van principally invented the CRYX 1000. Messrs. Moe and Maxwell used Mr. Hill's blueprints and the shell of the AFFX 2001 railcar to complete the construction of the CRYX 1000.

46. A December 10, 1985 letter from Mr. Marvin H. Weiner to Mr. M. Tom Maxwell,

General Manager of C.V. System Engineering, Inc., states as follows:

Dear Tom:

You should by now have received AFFX 2001 (hereinafter referred to as CRYX 1000) for refurbishment. . . .

The body of this letter contains the following paragraph:

It is also my understanding from Ralph [Hill] that he has discussed the matter of patent searches, clearances and indemnification with you. Indemnification should be for Lamb–Weston, Ralph and myself personally, Cryo–Trans and Mt. Airy Cold Storage.

Based on the ultimate performance of CRYX 1000, we see this as the forerunner of mutually exciting times for all of us.

At the time of this letter, Messrs. Hill and Weiner were concerned that Cryo–Van's liquid $CO_2$ bunker-style refrigeration system might be alleged to infringe the Rubin Carbonaire Plate $CO_2$ Snow Bunker System. (Pl.'s Ex. HP at 749). In the Rubin Patent [U.S. Letters Pat. No. 3,561,266], carbon dioxide gas was expanded within containers [bunkers] at the top of the vehicle storage area so as to form a deposit of snow within the containers. (Pl.'s Ex. AL). The snow provided a cold surface on the bottom of the containers to cool the circulating air within the vehicle. In addition, in one embodiment, a single vent was provided in each container to permit carbon dioxide gas to flow into the storage area. In another embodiment, the carbon dioxide gas was vented to the atmosphere outside of the container. There were concerns over a possible patent suit by Burlington Northern. (Def.'s Ex. 39). These concerns ultimately led to a proposed Patent License Agreement between Cryo–Trans and Burlington Northern. (Def.'s Exs. 27, 29, 35, 36; Pl.'s Ex. HP at 745). Cryo–Trans also entered into a Patent License Agreement with the owner of the Rubin Patent. (Tr. 259–264; Def.'s Ex. 48). Given this background, Messrs. Weiner and Hill's desire to obtain a "hold harmless" indemnification from Cryo–Van was understandable.

47. Cryo–Trans' request for "hold harmless" indemnification was accepted by Cryo–

Van by letter dated December 12, 1985. In closing, the letter stated the following:

Regarding a patent, our attorney of Washington, D.C. indicated there is no such patent [that] was applied [for in] recent year[s], however, as you understand, we are going to apply our concept as patent as soon as possible.

In this letter Messrs. Moe and Maxwell never claimed that they were the principal designers of the CRYX 1000. If they had been, it is extremely unlikely that they would have agreed to Mr. Weiner's "hold harmless" request without some reciprocal business consideration.

48. A February 4, 1986 letter written by Cryo–Van to Mr. Weiner upon the completion of the CRYX 1000 also makes no claim that Cryo–Van had designed the CRYX 1000. Instead, this letter merely refers to the "refurbishment of your CRYX 1000". (Def.'s Ex. 28).

49. Mr. Moe has no credible documentation which clearly and convincingly indicates that he conceived of the invention defined in the '876 Patent prior to the time the invention was conceived by Mr. Hill. The earliest documentation that Mr. Moe has which allegedly supports any claim of inventorship by him is a sketch of a $CO_2$ container having a manifold and exhaust system, which was sealed and mailed on December 17, 1985—after Mr. Moe had met Messrs. Hill and Weiner. (Pl.'s Ex. AK). The documentation submitted by GATC as evidence that Mr. Moe was the true inventor does not clearly contradict Mr. Hill's claim of inventorship. This Court specifically finds that the testimony of Messrs. Hill and Weiner about the development and invention of the '876 Patent was corroborated by admissible evidence and that Mr. Moe's testimony concerning the same issue was not. Unlike Mr. Hill, Mr. Moe had no historical involvement in the development of cryogenically refrigerated railcars. Mr. Moe had no experience with railcars or with $CO_2$ manifold systems prior to building the CRYX 1000 for Cryo–Trans.

50. From 1983 to 1988, Mr. David Burgener served as Food Program Manager and/or Director of Applications for the Cardox Corporation. This position gave him

engineering and marketing responsibilities with respect to the use of solid or liquid carbon dioxide for the refrigeration of food supplies. As part of the management of Cardox Corporation, Mr. Burgener was aware that a committee of the American Frozen Food Institute was exploring the feasibility of non-mechanical, cryogenic refrigeration for food shipments on railcars, and that Cardox was being solicited as a supplier of the liquid carbon dioxide to be used in such cryogenically refrigerated railcars. Cardox was at that time, and long has been, in the business of selling solid or liquid carbon dioxide for use in refrigeration systems.

51. In March of 1986, Mr. Burgener witnessed the maiden voyage and unloading of the CRYX 1000 at the Mt. Airy Cold Storage warehouse in Mt. Airy, Maryland. The unloading of the CRYX 1000 occurred on March 14, 1986 at Cryo–Trans' Mt. Airy Cold Storage warehouse in Mt. Airy, Maryland. At the unloading were representatives from Mt. Airy Cold Storage, Lamb–Weston, Liquid Air–Cardox, and the Burlington Northern Railroad. The unloading was also not a secret event. All who attended were there at the invitation of defendant Cryo–Trans' chief executive officer, Mr. Weiner and/or Mr. Hill.

52. A July 2, 1986 letter from Mr. Weiner to Mr. Hill, which significantly predates this controversy and resulting litigation, also documents that Mr. Hill was the inventor of the CRYX 1001 design. (Def.'s Ex. 38).

53. On August 12, 1986, Ralph Hill, while still a Lamb–Weston employee, filed a patent application for the cryogenic refrigeration system at issue. The Hill patent application was prepared by Lamb–Weston's attorney, Kenneth Klarquist. (Stip. No. 8). He did not have a copy of the original design blueprints in his file. He did have a copy of a sketch of the railcar reflecting changes to be made at Mells Cargo from the original CRYX 1000, which he could use to describe the best mode of the patented invention. (Klarquist Dep. at 103; Tr. 546).

54. Kenneth Klarquist, received, but did not disclose to the Patent Office, the Kurth British Patent 399,678 (Stip. No. 10; Pl.'s Ex. CR) ("the Kurth Patent"). Klarquist received the Kurth Patent and other prior art patents from Mr. David Abrams, who was Mr. Weiner's patent attorney. (Stip. No. 9). Klarquist indicated that his usual practice was that he would, in fact, have received such materials, and supplemented the disclosure already made to the Patent Office if he believed it was appropriate. (Klarquist Dep. at 63, 66–68).

55. The Kurth Patent (Pl.'s Ex. CR) discloses a cryogenic refrigerated railcar with an overhead solid carbon dioxide bunker system having a plurality of openings arranged along the side walls for downward flow into the cargo area of sublimated $CO_2$ gas. (Pl.'s Ex. CR; Tr. 582, 599).

56. On or about December 2, 1986, the Patent and Trademark Office of the United States Department of Commerce rejected Mr. Hill's patent application stating:

The following ... quotation of 35 U.S.C. 103 ... [is] the basis for all obvious rejections set forth in this Office:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

Subject matter developed by another person, which qualifies as prior art only under subsection (f) and (g) of section 102 of this title, shall not preclude patentability under this section where the subject matter and the claimed invention were, at the time the invention was made, owned by the same person or subject to an obligation of assignment to the same person.

*Claims 1–6* are rejected under 35 U.S.C. 103 as being unpatentable over Fink *et al* or Cryogenic Rail Car in view of Hall. It would [be] obvious to modify either Fink *et al* or Cryogenic Rail Car to arrange the $CO_2$ flow within the wall channels for sinu-

ous flow as taught in Hall Fig. 7. (Pl.'s Ex. 2).

To obtain reconsideration of this denial, Hill amended Claims 1 and 6 of the Application to stress the corrugated nature of the containers' walls. (Pl.'s Ex. 2).

57. On November 10, 1987, Hill's application was granted, and the '876 Patent was issued. The '876 Patent states that "it is an object of the invention to provide a railcar construction utilizing carbon dioxide snow as the refrigerant wherein all the contents of the car will be maintained within desirable temperature limits during shipment." (Def.'s Ex. 200). The invention relates to a refrigeration system for vehicles, and more particularly to the construction of storage compartments for utilizing carbon dioxide as a refrigerant in transporting products by vehicles such as trucks, trailers, railcars and the like. In April of 1990, Cryo–Trans acquired the '876 Patent from Lamb–Weston. (Def.'s Ex. 142).

58. Mr. Hill testified he last saw the original blueprints at Lamb–Weston. (Tr. 124). During the proceedings in this case, Mr. Hill was unable to produce the original blueprints that led to the '876 Patent. In 1988, after Mr. Hill's departure, Lamb–Weston was sold to Con–Agra, Inc. Thereafter Lamb–Weston's headquarters were moved from Portland, Oregon to Pasco, Washington and a substantial number of business records from Lamb–Weston were discarded. (Stip. No. 27). The original blueprints may have been discarded by Lamb–Weston.

59. Claim 1 of the '876 Patent is an independent claim from which the other claims—claims 2 through 3—depend:

*Claim 1.* In a container adapted to be maintained in a refrigerated condition from the sublimation of carbon dioxide snow the combination comprising:

a storage area defined by a floor, a pair of opposed side walls, a pair of opposed end walls, and a ceiling means;

an insulated roof positioned above said ceiling means and defining therewith a compartment for supporting a supply of carbon dioxide snow, said compartment extending substantially the full length of said car;

means in said compartment for forming carbon dioxide snow and means for connecting said carbon dioxide snow forming means to a supply of liquid carbon dioxide;

a plurality of openings through said ceiling means adjacent each of said side walls and end walls for permitting the flow of sublimated carbon dioxide gas from said compartment;

each of said walls being corrugated to define a plurality of channels therein open-sided toward the interior of the container whereby said carbon dioxide gas may flow from said openings in said ceiling means downwardly through said channels between said walls and a product load disposed in said container toward said floor.

Claims 2 and 3 of the patent incorporate all of the limitations of claim 1.

In addition to that which is recited in claim 1, claim 2 calls for the "ceiling", or bunker floor, to be insulated to resist heat transfer therethrough:

*Claim 2.* The container of claim 1 wherein said ceiling means comprises a layer of insulation to inhibit the transfer of heat through said ceiling means from said storage area.

In addition to the limitations of claim 1, claim 3 states that the floor of the container is formed with a plurality of open top channels extending from one end wall to the other:

*Claim 3.* The container of claim 1 wherein said floor is defined by a plurality load supporting elements defining open top floor channels extending substantially from one end wall to the other.

60. Immediately prior to trial, Cryo–Trans limited its claim for infringement of the '876 Patent to any of Claims 1, 2 and 3. (Final Pretrial Order: Waiver of Claims).

61. The term "adjacent" as used in patents means not necessarily at but nearby or near. (Tr. 539).

62. On November 8, 1977, United States Letters Patent, No. 4,057,367 was issued to Mr. James S. Moe, and Messrs. Marvin B. Carter and Ray L. Carter for their invention of a *"Combined Rotary–Reciprocating Piston Compressor,"* to-wit: "[a] compact but high volume displacement, relatively noiseless and vibration free compressor for refrigeration gas or the like combining a rotary drive input with six cylinders and three reciprocating pistons within a rotor housed in a stator." (Pl.'s Ex. AY).

63. On August 9, 1988, United States Letters Patent, No. 4,761,969 issued to Mr. James. S. Moe for the invention of "[a] nonmechanical refrigeration system particularly for use in a large insulated container such as a truck or railroad car for maintaining perishables at a desired low temperature during shipment. A cryogenic material such as liquid $CO_2$ is used in a plurality of modes to permit or prevent exposure of the foodstuffs to $CO_2$ vapors." (Pl.'s Ex. AZ).

64. Mr. Moe never sought to patent an invention exactly like the '876 Patent and his attorney never challenged the issuance of the '876 Patent to Mr. Hill.

65. The cryogenic refrigeration system covered by the '876 Patent at issue in this case, is essentially

[a] railcar refrigerated by carbon dioxide snow [with a] compartment at top for containing a supply of such snow. Openings are provided along each side and end wall for escape of carbon dioxide gas from [the] compartment so it can flow down along each side of load and envelop same. Floor of car is formed with longitudinal channels with manifolds at ends of car to cause flow of gas toward one end along side walls and then through interior channels to discharge opening at opposite end.

66. Columns 1 and 2 of the specification text of the '876 Patent make reference to and distinguish the subject invention from such prior art as the Fink patent, which refers to a bunker-style cryogenically refrigerated railcar, and the AFFX 2001 railcar. As concerns the AFFX 2001 railcar, the '876 Patent notes as a problem the direct deposit of carbon dioxide snow on the cargo load, causing overfreezing at exposed parts of the load.

The Fink patent is acknowledged to disclose a bunker to contain carbon dioxide snow out of contact with the load, but is reported to not be effective in enveloping the load with cold carbon dioxide gas since the openings in the bunker floor are only along one side wall of the car. (Pl.'s Ex. A).

67. The specification text and drawings of the '876 Patent describe a railcar refrigerated by carbon dioxide snow which is deposited in a compartment or bunker beneath the roof of the railcar and overlying the cargo area of the railcar. The use of carbon dioxide as a refrigerant and the use of a bunker to hold carbon dioxide snow is all part of and taught by the prior art.

Openings are provided along each side and end wall of the bunker floor through which sublimating carbon dioxide gas escapes from the bunker to flow down along the side walls and end walls of the car, enveloping the cargo. The use of openings in the ceiling of or in a bunker beneath the roof of a container to allow carbon dioxide gas to escape to and envelop the cargo below is all part of and taught by the prior art.

Each of the cargo area walls is formed with sinuous channels to permit the flow of the carbon dioxide gas towards the floor beneath the cargo. The use of channeled or corrugated walls to permit the flow of the carbon dioxide gas towards the floor beneath the cargo, and the use of sinuous channels for this purpose is all part of and taught by the prior art.

The floor of the car is formed with open top lengthwise channels to receive the carbon dioxide gas and conduct it to one end of the car containing a discharge vent communicating with the atmosphere exterior to the railcar. The use of all-air flooring, including the use of open top lengthwise channels to receive the carbon dioxide gas, was all part of and taught by the prior art.

68. But for the lack of a "compartment" the third clause of claim 1, *to-wit:*

means in said compartment for forming carbon dioxide snow and means for con-

necting said carbon dioxide snow forming means to a supply of liquid carbon dioxide Would read on the AFFX 2001 railcar.

69. The '876 Patent specification describes the invention arrangement as effecting a flow of cold carbon dioxide gas from the bunker area to envelop the cargo load in the car.

"... because the cold carbon dioxide gas is flowing downwardly on each of the opposite sides and on the ends of the car and in direct contact with the bottom of the load, all parts of the load will be maintained at a desirably low temperature to preserve the quality of the product shipment."

70. Because of concerns Mr. Weiner had about C.V. Engineering's ability to quickly construct further CRYX 1000 cars, the CRYX 1000 was sent to Mells Cargo, Inc. ("Mells") in Sacramento, California, an established business with extensive experience in working with railcars. (Tr. 105).

71. Mells rebuilt the CRYX 1000 bunker system and other components of the car. After Mells rebuilt the CRYX 1000, Weiner contracted with Mells to retrofit the first 150 used cars of Cryo–Trans "C" plate fleet. (Tr. 267–68).

72. The original CRYX 1000 included vertical ducts, which served as exhaust vents, which were designed by C.V. Engineering. These ducts were not included in the '876 Patent and were removed at Mells. Mells also rebuilt the flooring in the CRYX 1000. (Tr. 106).

73. Mr. Weiner personally borrowed $8.5 million in order to purchase used mechanical cars and rebuild them into the first 150 cars of Cryo–Trans' "C" plate fleet. (Tr. 267). Thereafter, Mr. Weiner incorporated Cryo–Trans and began entering into leasing agreements with Lamb–Weston and other food processors. While mass construction of the CRYX 1000 was underway, problems developed relating to its manifold pressure which caused the roofs of the railcars to be ruptured. Cryo–Trans spent close to $1 million working out these problems to improve the CRYX 1000. (Tr. 269–70).

74. During the '876 Patent Application, Lamb–Weston's patent attorney described the Mells' modified version of the CRYX 1000 to the patent examiner. (Tr. 546).

75. Shortly after Cryo–Trans began construction of its "C" plate fleet, Mr. Weiner conceived of an improved "high cube" version of Mr. Hill's design. Instead of being limited by the size of the "C" plate shell, Mr. Weiner's high cube design optimized interior car dimensions to fit the size of the boxes used as product packaging by various food processors.

76. Commencing in the Spring of 1987, Mr. Weiner approached Gunderson, Inc. ("Gunderson") in Portland, Oregon to arrange for the production of a prototype high cube car. Gunderson's engineering department, working in conjunction with Mr. Weiner, developed a comprehensive set of blueprints for the car which Gunderson labeled the "Weinermobile". (Def.'s Ex. 85; Tr. 274).

77. Gunderson built the shell of the high cube car in the Fall of 1987. The car was then moved to Mells where the $CO_2$ bunker system and walls were installed in accordance with Hill's design, as well as other structures. The car also included a customized "high profile" plug door designed specifically for Cryo–Trans by Youngstown Door Company in Ohio. (Tr. 284).

78. After two years of testing, Cryo–Trans was able to lease fifty high cube production cars in 1989 or early 1990. (Tr. 276–79). By that time, Cryo–Trans had increased its "C" plate fleet to a total of 222 cars which were under lease.

79. The food processors who leased Cryo–Trans' cars were able to ship their product at a transportation cost that was considerably lower than the cost of using the older, mechanical cars. (Tr. 285–86).

80. Lewis Tyree was an inventor who was active in AFFCAR and who was paid to work on inventions to increase the use of $CO_2$. It was in his financial interest to come up with an invention similar to the '876 Patent. He did not. (Def.'s Ex. 224 ¶ 33). The same financial incentive applied to David Burgener yet he also did not invent the '876 Patent. (Tr. 988).

81. Burlington Northern had an interest in building a $CO_2$ railcar that worked. Burlington Northern did not conceive of the '876 Patent design. Instead, it built 75 $CO_2$ railcars employing the Fink and Habel Patent design, which were not effective.

82. GATC has over 61,000 cars of all types under lease. (Tr. 353). In late 1990, GATC decided it had to promptly get into the cryogenic railcar market and copy Cryo–Trans' high cube car. (Def.'s Ex. 226, Tr. 334–36, 398).

83. GATC recognized it needed the '876 Patent to get involved in the marketplace and tried to hire Mr. Hill. (Tr. 375–77; Def.'s Ex. 223).

84. GATC had Gunderson make a shell identical to the Cryo–Trans high cube car. Gunderson also provided GATC with a set of engineering drawings it had originally made for Weiner and Cryo–Trans. (Def.'s Exs. 127, 131, 133; Tr. 467–69).

85. GATC then moved the shell from Gunderson's to Mells for completion of the interior. The GATC car was completed by Mells along with the identical cars Mells was completing for Cryo–Trans. (Tr. 392).

86. GATC spent $130,000 to have a prototype copy of Cryo–Trans' railcar built as a tag-along order to the Cryo–Trans cars being built. (Tr. 338).

87. The prototype railcar GARX 68000 was originally produced with openings in the bunker floor adjacent the end walls of the car. In April, 1991, after this lawsuit was filed, GATC blocked up these end wall openings before commencing production of the Arcticar railcar design. From its first demonstration run in December 1990 to April 1991, GATC admits the GARX 68000 car literally infringed claims 1, 2, and 3 of the Hill '876 Patent, if valid and enforceable. (Stip. No. 25).

88. The Arcticar is cryogenically refrigerated with carbon dioxide snow deposited in a bunker area beneath the roof of the car. The source of the snow is a manifold pipe mounted along the roof and length of the car, and connected to a source of liquid carbon dioxide for charging the bunker. The floor of the bunker area serves as the ceiling to the cargo area beneath. The walls of the Arcticar in the cargo area are formed with corrugated, open channels extending from the bunker floor to the floor of the car.

89. The bunker floor vent opening arrangement in the Arcticar is as shown in Plaintiff's Exhibit CG. The bunker floor is provided with openings along both side walls (which are disposed 6 inches from the side walls and no closer to any end wall than 3 feet) and a row of openings along the center line of the bunker floor (which are disposed 4½ feet from each side wall and no closer than 6 feet from an end wall). The vent opening arrangement in the Arcticar bunker floor provides a cooling flow which, in the form of sublimated carbon dioxide gas, passes from the bunker area down along both side walls of the railcar and also through the center line openings into a dispersement chamber on top of the load. The gas deposited into the central dispersement chamber on top of the load radiates over the top of the load to permeate through the load and/or spread out over the top of the load to pass down along the side or end of the load wherever a pressure differential occurs accommodating such a flow.

90. The only significant change made to the GARX 68000 in its transformation into the Arcticar, relative to claims 1, 2 and 3 of the Hill '876 Patent, was the elimination of the ceiling bunker vents on each of the end walls of the railcar. (Stip. No. 26).

91. In designing the Arcticar production railcar, GATC was cognizant of the '876 Patent and eliminated end wall vents on the bunker floor system precisely to avoid infringement of the '876 Patent. (Tr. 521–22).

92. Mr. Mowatt–Larssen, GATC's engineer, admitted that the Arcticar does not work any differently than the first GATC prototype in the way the load is cooled. (Tr. 486).

93. The Court's own observation and inspection of the Arcticar disclosed that it did not work any differently than the Cryo–Trans high cube car.

94. GATC copied the design of the Cryo–Trans high cube car after the commercial

viability of the technology was proven by Cryo–Trans.

95. There is no perceptible market difference between the Cryo–Trans railcar and the Arcticar. (Tr. 341, 360–61; Def.'s Ex. 186).

96. Prior to the introduction of the Arcticar production railcar, GATC sought and obtained the advice of outside patent counsel concerning its possible infringement of the '876 Patent. In a written opinion dated November 16, 1990, GATC was advised by outside patent counsel that its Arcticar production railcar design did not infringe the '876 Patent. (Tr. 512–18; Pl.'s Ex. HI).

97. GATC has produced and leased approximately 80 Arcticar railcars. (Stip. No. 16).

98. At the time of trial GATC also had orders for 100 more Arcticar railcars. (Tr. 360).

99. The '876 Patent design has enjoyed a high degree of commercial success, not only from the standpoint of reducing transportation costs for food processors, but also from the standpoint of making Cryo–Trans a profitable leasing company. The '876 Patent design has been accepted by the industry. (Tr. 371; Def.'s Ex. 223). This was the main reason GATC decided to enter the market.

100. The '876 Patent design solved a long felt transportation problem for frozen food processors, who were searching for a viable solution since 1980 to the poor economic and maintenance viability of old railroad mechanical cars. This is especially true in view of our planet's confirmed environmental and related climate problems which have led to new record hot temperatures throughout our country during the last several years.

### CONCLUSIONS OF LAW

1. Cryo–Trans has the burden of proving by a preponderance of the evidence that GATC's Arcticar falls within the scope of Claim 1 of the '876 Patent. *Lemelson v. United States,* 752 F.2d 1538, 1547 (Fed.Cir. 1985). Literal infringement is found when the accused device embodies all the elements of the claimed invention. *Mannesmann Demag Corp. v. Engineered Metal Prods. Co.,* 793 F.2d 1279, 1282 (Fed.Cir.1986), *Texas Instruments Inc. v. United States Int'l Trade Comm'n,* 988 F.2d 1165, 1171 (Fed. Cir.1993). If the Arcticar is found to have at least each and every feature specified in Claim 1, then the claim is literally infringed. *Read Corp. v. Portec, Inc.,* 970 F.2d 816, 821 (Fed.Cir.1992). Even if all of the features of the Claim are not literally present, under the "doctrine of equivalents", infringement may be found if the Arcticar performs substantially the same function, in substantially the same way, to achieve substantially the same result as the subject matter of the claim. *Id.* at 821; *Black & Decker, Inc. v. Hoover Serv. Ctr.,* 886 F.2d 1285, 1293–94 (Fed.Cir.1989).

2. The construction of a patent claim is a matter of law which can be determined by a review of all relevant evidence including the patent's prosecution history and extrinsic evidence regarding the true meaning of the language employed in the patent. *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 977–79 (Fed.Cir.1995). It is undisputed that GATC's production version of the Arcticar has each and every element of Claim 1 of the '876 Patent except bunker vents "adjacent" to the end walls. (Trial Stip. No. 17). In the Arcticar, the vents nearest each end wall are 2 feet, 9 inches away (Tr. 480). The Arcticar has an interior length of 67 feet, 8 inches, which is identical to the Cryo–Trans car. (Trial Stip. No. 21; Tr. 279–280). Its end-most bunker vents are less than five percent of the distance measured from end to end of the car. Because the terms of a Claim "will be given their ordinary meaning, unless it appears that the inventor used them differently" this Court finds on the basis of all of the relevant evidence that the term "adjacent" as used in the '876 Patent means "not far off". (Ex. 134; Tr. 539). *See ZMI Corp. v. Cardiac Resuscitator Corp.,* 844 F.2d 1576, 1579 (Fed. Cir.1988). Since the vents nearest the end walls of the Arcticar are "not far off", this Court finds the Arcticar within the scope of the meaning of "adjacent" as used in Claim 1.

3. The purpose of the bunker vents of the '876 Patent is to facilitate the passage of sublimating $CO_2$ along the corrugations making up the walls of the car. The Arcti-

car's bunker vents are close enough to provide the same function. Given the proximity of the Arcticar bunker vents to the end walls, the Arcticar literally infringes the '876 Patent.

4. Based on the Court's careful review of all the admissible evidence as well as its personal observation of the two cryogenic railcars, the Court finds that the GATC ARCTICAR is simply a copy of the Cryo–Trans car. The Court's own physical inspection of the Cryo–Trans and Arcticar disclosed that both cars operate in essentially the same manner. The Arcticar performs substantially the same function, in substantially the same way, to achieve substantially the same result as the invention defined in the '876 Patent. (Tr. 540–45, 1084; Def.'s Ex. 234 ¶ 25, Appendices A & B). Thus, Cryo–Trans has carried its burden of proof of establishing that the Arcticar infringes Claim 1 of the '876 Patent under the doctrine of equivalents. *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.,* 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950).

5. The ARCTICAR has an insulated bunker floor which is the same as the subject matter specified in Claim 2 of the '876 Patent. Claim 2 is therefore literally infringed.

6. The ARCTICAR has a plurality of floor ribs or slats which are the same thing as the subject matter specified in Claim 3 of the '876 Patent. Claim 3 is therefore literally infringed.

7. Cryo–Trans has satisfied its burden of proof in establishing by a preponderance of evidence that the GATC ARCTICAR literally infringes Claims 1, 2 and 3 of the '876 Patent. Alternatively, Cryo–Trans has established that the GATC ARCTICAR infringes the '876 Patent under the doctrine of equivalents.

8. A patent is presumed valid, 35 U.S.C. § 282. The presumption of validity afforded by § 282 places the burden of persuasion by clear and convincing evidence, upon the party asserting invalidity. *SSIH Equip. S.A. v. United States Int'l Trade Comm'n,* 718 F.2d 365, 375 (Fed.Cir.1983).

9. When all the various terms of a patent claim read directly on an item of prior art, then the prior art "anticipates" the claim and the patent claim is invalid under 35 U.S.C. § 102.

10. When a party asserts that prior use or knowledge of an item by others is prior art, it must be shown that the use was of a complete and operable product that was reduced to practice. *See* 1 Chisum, Patents, § 305[2], at 3–80; *Medtronic, Inc. v. Daig Corp.,* 611 F.Supp. 1498, 227 U.S.P.Q. 509, 515 (D.Minn.1985), *aff'd,* 789 F.2d 903 (Fed. Cir.), *cert. denied,* 479 U.S. 931, 107 S.Ct. 402, 93 L.Ed.2d 355 (1986). Once the earlier invention has been sufficiently tested to demonstrate that it will work for its intended purpose, the earlier invention is considered reduced to practice. *Atlantic Thermoplastics Co., Inc. v. Faytex Corp.,* 5 F.3d 1477, 1480 (Fed.Cir.1993).

11. In order to be patentable an invention must not be obvious to a person of ordinary skill in the art at the time the invention was made. *Graham v. John Deere Co.,* 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). Pursuant to 35 U.S.C. § 103, a patent claim is invalid if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject pertains. In determining obviousness, the person of ordinary skill in the art is pictured as working in his shop with the prior art hanging on the walls around him. *Union Carbide Corp. v. American Can Co.,* 724 F.2d 1567, 1576 (Fed.Cir.1984). The obviousness test seeks to determine whether the hypothetical person of ordinary skill in the relevant art, familiar with all that the relevant art discloses and reasonably suggests, would find the claimed invention obvious. *In re Sovish,* 769 F.2d 738, 742 (Fed. Cir.1985).

12. In this case, a person of ordinary skill in the art is an individual having a college degree or equivalent experience in the field of cryogenic refrigeration design and who is mechanically inclined and familiar with refrigerated transport design. These persons are Messrs. David Burgener, Ralph Hill, Er-

ling Mowatt–Larssen, Tom Maxwell, Mel McCracken and James S. Moe.

13. The issue of obviousness under § 103 is a question of law based on the Court's factual determinations. *Graham v. John Deere Co.,* 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). The Court must usually determine the scope and content of the relevant prior art, the difference between the prior art and the claimed subject matter, the level of ordinary skill in the pertinent field of endeavor and any objective evidence of non-obviousness. *Graham,* 383 U.S. at 18, 86 S.Ct. at 694.

14. Invalidation of a patent claim under § 103 requires a determination that it would have been obvious to combine prior art existing at the time the invention was made to produce the claimed subject matter. 35 U.S.C. § 103; *Uniroyal, Inc. v. Rudkin–Wiley Corp.,* 837 F.2d 1044, 1050–51 (Fed.Cir.), *cert. denied,* 488 U.S. 825, 109 S.Ct. 75, 102 L.Ed.2d 51 (1988). Courts are expressly prohibited from using the patent or invention at issue as a guide to combine bits and pieces of earlier designs and then reach a conclusion of obviousness. The decisionmaker must forget what he or she has been taught about the claimed invention and cast the mind back to the time the invention was made. *W.L. Gore & Assocs., Inc. v. Garlock, Inc.,* 721 F.2d 1540, 1552–1553 (Fed.Cir.1983), *cert. denied,* 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984).

15. The question of obviousness should not be decided by reference through hindsight by using the asserted claim as a guide through a maze of prior art references which combine the right references in the right ways so as to achieve the result of the invention, as defined by the asserted claim. Monday morning quarterbacking is quite improper when resolving the question of nonobviousness in a court of law. *Orthopedic Equip. Co. v. United States,* 702 F.2d 1005 (Fed.Cir.1983).

16. A showing of commercial success of the patented invention is objective evidence of nonobviousness. *Bio–Rad Lab., Inc. v. Nicolet Instrument Corp.,* 739 F.2d 604, 611–12 (Fed.Cir.), *cert. denied,* 469 U.S. 1038, 105 S.Ct. 516, 83 L.Ed.2d 405 (1984). Another form of objective evidence of nonobviousness is that the patented invention filled a long felt need in the pertinent industry. *Kansas Jack, Inc. v. Kuhn,* 719 F.2d 1144, 1150 (Fed.Cir.1983). Copying or adoption of the patented invention by others is also objective evidence of nonobviousness. *Diversitech Corp. v. Century Steps, Inc.,* 850 F.2d 675, 679 (Fed.Cir.1988). Finally, recognition and praise of the invention is objective evidence of nonobviousness. *W.L. Gore & Assocs., Inc. v. Garlock, Inc.,* 721 F.2d 1540, 1555–56 (Fed.Cir.1983), *cert. denied,* 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984).

17. GATC has alleged that the '876 Patent is invalid because its subject matter was known, used, or invented by another. Given the Court's factual findings, GATC has failed to establish, by clear and convincing evidence, that this is the case. The CRYX 1000 does not anticipate the '876 Patent under 35 U.S.C. § 102 because the principal design of the CRYX 1000 was conceived of by Mr. Hill. This Court expressly concludes that GATC has failed to establish that the '876 Patent is invalid under any of the other applicable statutes relating to inventorship. *In re Yates,* 663 F.2d 1054 (C.C.P.A. 1981): *Novo Industri A/S v. Travenol Lab., Inc.,* 677 F.2d 1202 (7th Cir.1982).

18. GATC has also alleged that the '876 Patent is invalid under 35 U.S.C. § 103 because its claims would have been "obvious". Obviousness is a question of law. *Graham v. John Deere Co.,* 383 U.S. at 15, 86 S.Ct. at 692. Having considered the various factors mandated by *Graham v. John Deere,* and based on the Court's findings of fact this Court expressly finds that GATC has not met its burden of proving invalidity, by clear and convincing evidence, under 35 U.S.C. § 103.

19. The relevant scope and content of prior art in this case includes the Fink and Habel Patent, which is the closest prior art. The Fink and Habel Patent discloses a cryogenic railcar with a bunker with vents only on one side. (Pl's Ex. DF; Tr. 555, 1007, Def.'s Ex. 234 ¶ 22). The Fink and Habel Patent, which relates to the AFFX 2002, was

disclosed to the patent examiner by Mr. Hill's attorney. The next most pertinent art, which was also disclosed to the patent examiner, is the Cryogenic Railcar Report which describes the various prototype railcars developed by AFFCAR, including the AFFX 2002. (Def.'s Ex. 18). The Rubin Patent, which involves two containers in a vehicle transport with ceiling vents on both sides is also relevant prior art. (Pl's Ex. AC). This patent was also reviewed by the patent examiner. The Kurth British Patent, which discloses a bunker floor which allows sublimated gas from solid $CO_2$ to pass through apertures in the bunker floor down into a cargo area is also relevant prior art. (Pl's Ex. CR). The '876 Patent represents a significant improvement from the relevant prior art and is not obvious from a review of the relevant prior art. (Def.'s Ex. 234). No single item of prior art discloses the same thing or anticipates the invention specified by the '876 Patent claims.

20. There is no clear suggestion of combining different pieces of prior art to produce the invention claimed by the '876 Patent unless the patent is improperly used as a guide to make the combination.

21. The '876 Patent discloses a new approach to in-transit cooling. It uses a pre-deep freezing form of cooling because it substantially pre-deep-freezes the most exposed portion of the load during the time the bunker is being charged with $CO_2$ snow through an adequate distribution of vents provided from the bunker area.

22. The Court specifically finds that the '876 Patent, as improperly copied by GATC, has had considerable commercial success in the marketplace and has served to satisfy a long felt need in the art. All of these factors, along with the failure of other persons of ordinary skill in the art to make the invention, has served to convince this Court that the '876 Patent is not invalid because its claims would have been "obvious". *Graham v. John Deere Co.*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530 (Fed.Cir.1983); *Perkin–Elmer Corp. v. Computervision Corp.*, 732 F.2d 888 (Fed.Cir.),

*cert. denied,* 469 U.S. 857, 105 S.Ct. 187, 83 L.Ed.2d 120 (1984).

23. Every applicant for a patent has a duty of candor and good faith in its dealing with the Patent Office and the Examiner handling his application. This means that the applicant and his or her lawyer must not intentionally withhold or misrepresent material information concerning the invention, as defined by the asserted claim. A breach of this duty is inequitable conduct and renders the patent unenforceable.

24. Inequitable conduct before the Patent Office arises from failure to disclose material information, or submission of false material information with an intent to deceive the Patent Office. *FMC Corp. v. Manitowoc Co.*, 835 F.2d 1411 (Fed.Cir.1987). To show that Cryo–Trans is guilty of inequitable conduct because of its "failure to disclose" prior art GATC must offer clear and convincing proof of (1) prior art or information that is material; (2) knowledge chargeable to Hill of that prior art or information and of its materiality; and (3) that Hill's failure to disclose the art or information resulted from an intent to mislead the Patent Office. *Id.* at 1415; *Hewlett–Packard Co. v. Bausch & Lomb Inc.*, 882 F.2d 1556, 1562 (Fed.Cir. 1989), *cert. denied,* 493 U.S. 1076, 110 S.Ct. 1125, 107 L.Ed.2d 1031 (1980); *Kingsdown Medical Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867 (Fed.Cir.1988), *cert. denied,* 490 U.S. 1067, 109 S.Ct. 2068, 104 L.Ed.2d 633 (1989). To satisfy the "intent to deceive" element of inequitable conduct, "the involved conduct, viewed in light of all the evidence, including evidence indicative of good faith, must indicate sufficient culpability to require a finding of intent to deceive." *Paragon Podiatry Lab., Inc. v. KLM Lab., Inc.*, 984 F.2d 1182, 1189 (Fed.Cir.1993).

25. "Inequitable conduct" is not, or should not be, a magic incantation to be asserted against every patentee. Nor is that allegation established upon a mere showing that art or information having some degree of materiality was not disclosed. *FMC Corp. v. Manitowoc Co., Inc.*, 835 F.2d 1411, 1415 (Fed.Cir.1987). A patent applicant is under no obligation to disclose "all pertinent prior

art or other pertinent information of which he is aware." *Digital Equip. Corp. v. Diamond,* 653 F.2d 701, 716 (1st Cir.1981). The two controlling factors are the *materiality* of the information and the *intent* of the action. *Id.*

■ 26. In evaluating "inequitable conduct" the knowledge and actions of a patent applicant's attorneys are chargeable to the applicant. *Argus Chem. Corp. v. Fibre Glass–Evercoat Co.,* 759 F.2d 10, 14–15 (Fed. Cir.), *cert. denied,* 474 U.S. 903, 106 S.Ct. 231, 88 L.Ed.2d 230 (1985).

■ 27. The Kurth Patent qualifies as a prior art publication pursuant to 35 U.S.C. § 102(b). Mr. Hill's failure to disclose the Kurth Patent was material because there was a substantial likelihood that a reasonable examiner would have considered it important in deciding whether to issue the patent-in-suit. *J.P. Stevens & Co. v. Lex Tex, Ltd.,* 747 F.2d 1553 (Fed.Cir.1984), *cert. denied,* 474 U.S. 822, 106 S.Ct. 73, 88 L.Ed.2d 60 (1985).

■ 28. There must be an element of bad faith or total recklessness to find fraud or inequitable conduct. *Digital Equip. Corp. v. Diamond,* 653 F.2d 701 (1st Cir.1981); *Norton v. Curtiss,* 433 F.2d 779, 795–96 (C.C.P.A.1970). *See also* Tegtmeyer, *Fraud on the Patent and Trademark Office Under Rule 56,* 58 *J. Pat. [ & Trademark] Off. Soc'y.* 550, 561 (1976).

■ 29. To establish fraud on the Patent Office a substantial degree of "wrongfulness" is required to be shown. Applicants for patents do not engage in fraudulent conduct when they make "honest mistakes in judgment" concerning the information material to consideration of their applications, nor does some slight deviation from the requisite standard of care suffice as fraud. *Digital Equip. Corp. v. Diamond,* 653 F.2d 701, 715 (1st Cir.1981).

■ 30. A fraud finding also requires that the withheld information meet a rather high standard of materiality. "Materiality" has generally been interpreted to mean that if the Patent Office had been aware of the complete or true facts, the challenged claims would not have been allowed. *Norton v. Curtiss,* 433 F.2d 779, 794–95 (C.C.P.A.1970). To establish fraud, the nondisclosed information must be such as to have a likely effect on the scope of allowable claims or the issuance of the patent. It is not enough that the information be simply "relevant" in some general sense to the subject matter of the claimed invention, or even to the invention's patentability. *Digital Equip. Corp. v. Diamond,* 653 F.2d 701, 716 (1st Cir.1981). To satisfy the intent to deceive element of inequitable conduct, "the involved conduct, viewed in light of all the evidence, including evidence indicative of good faith, must indicate sufficient culpability to require a finding of intent to deceive." *Kingsdown Medical Consultants, Ltd. v. Hollister Inc.,* 863 F.2d 867, 876 (Fed.Cir.1988), *cert. denied,* 490 U.S. 1067, 109 S.Ct. 2068, 104 L.Ed.2d 633 (1989).

31. GATC has not shown by clear and convincing evidence that the '876 Patent is unenforceable because of fraud on the Patent Office. There is no evidence indicating intent to mislead the Patent Office in connection with obtaining allowance of the '876 Patent. At best the evidence tends to indicate that Mr. Hill's counsel negligently failed to present certain relevant prior art to the Patent Office. The Court can not conclude that the totality of the circumstances establishes an intent to mislead or deceive the Patent Office by clear and convincing evidence.

32. Mr. Hill's Patent Application, which attached the Cryogenic Railcar Report, sufficiently disclosed relevant prior art. (Def.'s Exs. 1, 2). Although the better practice would have been for Mr. Klarquist to have disclosed the Kurth Patent, this prior art was not intentionally hidden from the Patent Office. Because the materiality of the Kurth Patent is open to some debate because it did not contain a manifold system for manufacturing $CO_2$ snow, the Court does not find its materiality to be high enough to establish fraud on the Patent Office given the dearth of evidence regarding Mr. Hill's intent to deceive.

33. Mr. Hill was represented by Lamb–Weston's patent attorney during his patent application because at the time he applied for the '876 Patent he was a Lamb–Weston em-

ployee. There is no evidence to indicate that Mr. Hill, Mr. Klarquist or Lamb–Weston had any motivation to deceive the Patent Office. To the contrary, the evidence shows that Mr. Hill and Mr. Klarquist both acted in good faith throughout the patent application process.

34. The patent laws provide that Cryo–Trans shall be awarded damages adequate to compensate for any infringement that is proven with "reasonable certainty". Damages are compensation for all loses suffered as a result of the infringement. Adequate compensation should return Cryo–Trans to the position it would have occupied had there been no infringement. However, Cryo–Trans is not entitled to speculative damages which, although possible, are wholly remote or left to conjecture and/or guess.

35. Lost profits may be in the form of diverted sales, eroded prices, or increased expenses. Cryo–Trans must establish causation between its claimed lost profits and the infringement. A factual basis for the causation is that "but for" the infringement, Cryo–Trans would have made the sales that the infringer made, charged higher prices, and/or incurred lower expenses. In order to show that Cryo–Trans would have made the sales defendant made, plaintiff must show that: (1) there was a demand for the patented product; (2) plaintiff had the ability to meet the market demand; and (3) there were no acceptable non-infringing substitutes or alternatives.

36. "Price erosion" occurs when a plaintiff is forced to lower prices due to the presence in the market of the defendant's infringing product. Cryo–Trans' price erosion losses can include projected future losses which are sufficiently established by a preponderance of the evidence.

37. At the time of trial, Cryo–Trans sought total damages of $51,626,166 which represent treble damages of $17,208,722 in actual damages. Cryo–Trans seeks trebled damages based on the asserted willfulness of GATC's conduct.

38. The parties have agreed that the proper method of assessing damages in this case is the lost profits analysis. (Tr. 1142).

39. The total lost profits to Cryo–Trans for leases entered into by GATC are $8,920,732. (Tr. 656; Supp. 6/15/95 Declaration of Aron Levko). Cryo–Trans has also suffered price erosion for a lease it executed in December of 1994 in the total amount of $562,157 (Tr. 660, 1144; Supp. 6/15/95 Declaration of Aron Levko). The Court specifically rejects some of the damage calculations made by GATC's expert, Mr. Sims, as being unduly conservative and unreasonable. (Pl.'s Ex. HT).

40. With the elimination of GATC from the market, the Cryo–Trans cars will become the most economical way to transport frozen foods. (Tr. 768–69). Because of this fact, as well as the Court's injunction against GATC's further use of all of its infringing cryogenic railcars, this Court finds that Cryo–Trans' additional price erosion damages of $7,926,250 for further price erosion on its potential future leases is speculative and unsupported by a preponderance of the evidence.

41. Prejudgment interest, at a rate of 7.54%, as the parties have agreed, is appropriate. Therefore, the Court awards prejudgment interest of $222,283. (Supp. 6/15/95 Declaration of Aron Levko).

42. Total damages suffered as a result of the infringement by GATC consisting of lost profits, price erosion and prejudgment interest amount to $9,705,172.

43. After careful consideration of all the relevant facts in this case, including GATC's prior art defense and the opinion letters it received from its counsel prior to its production of the Arcticar, the Court has concluded that GATC's infringement of the '876 Patent was not willful and that this case is not an exceptional case which warrants an award of attorneys' fees in favor of Cryo–Trans. 35 U.S.C. § 284; *Interspiro USA, Inc. v. Figgie Int'l, Inc.*, 18 F.3d 927, 933–34 (Fed.Cir.1994); *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 829 (Fed.Cir.1992); *Avia Group Int'l, Inc. v. L.A. Gear California, Inc.*, 853 F.2d 1557, 1567 (Fed.Cir.1988).

44. In accordance with this opinion, the Clerk of the Court is directed to enter judgment in favor of defendant Cryo–Trans on

plaintiff GATC's claim for declaratory judgment pursuant to 28 U.S.C. § 2201 with respect to the enforceability of the '876 Patent. The Clerk of the Court is also directed to enter judgment in the amount of $9,705,172 in favor of defendant Cryo–Trans with respect to its counterclaim for infringement of claims 1, 2 and 3 of the '876 Patent pursuant to 35 U.S.C. § 281. Pursuant to this judgment, GATC is hereby permanently enjoined from any further infringement of the '876 Patent as of August 1, 1995—the date that was used for the calculation of Cryo–Trans' damages.